**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

      v.

ANDRE DECKER,

                       Defendant.

1:24-cr-00361 (AMN)

---

| | |
|---|---|
| **APPEARANCES:** | **OF COUNSEL:** |
| **United States Attorney for the** | **ASHLYN JESSICA MIRANDA, ESQ.** |
| **Northern District of New York** | **MIKAYLA ESPINOSA, ESQ.** |
| 445 Broadway – Room 218 | Assistant United States Attorneys |
| Albany, New York 12207 | |
| *Counsel for the Government* | |
| | |
| **Frost, Kavanaugh Law Firm** | **ARTHUR R. FROST, ESQ.** |
| 287 North Greenbush Road | |
| Troy, New York 12180 | |
| *Counsel for Defendant* | |

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

On June 13, 2025, following a four-day trial, a unanimous jury convicted defendant Andre

Decker ("Defendant") of one count of possession of firearms by a prohibited person in violation

of 18 U.S.C. § 922(g)(1).  Dkt. Nos. 1, 97, 103.  Presently before the Court is Defendant's motion

for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure ("Rule 33").  Dkt.

No. 147 (the "Motion"); *see also* Dkt. No. 154.[1]  For the reasons set forth below, Defendant's

Motion is denied.

---

[1] After considering the Government's opposition, Defendant declined to submit a reply in further
support.  Dkt. No. 156.

## II.    BACKGROUND

### A.  Summary of the Trial Evidence

During the four-day trial, the Government presented substantial evidence to prove that

Defendant unlawfully possessed firearms on November 27, 2023.  *See, e.g.,* Dkt. No. 154 at 6-8

(Government's brief summarizing the trial evidence).[2]  The Court previously summarized some of

the evidence adduced at trial as follows:

> In the summer of 2023, Defendant completed a federal prison sentence and began
> a term of supervised release in the Southern District of New York.  Defendant's
> probation officer tried to meet with him for several months, without success.  In
> November 2023, the probation officer requested and received an arrest warrant
> from the United States District Court for the Southern District of New York.
>
> The United States Marshals Service ("USMS") was tasked with apprehending
> Defendant.    After  using  various  investigative  methods—including  in-person
> surveillance, analysis of location data from Defendant's cell phone, and analysis of
> numerous transactions from Defendant's public benefits card—a USMS task force
> came to believe that Defendant was staying in the Northern District of New York,
> at his girlfriend's apartment in Albany.  The task force obtained a warrant to search
> the premises for Defendant.
>
> The task force executed the warrant at approximately 6:00 a.m. on November 27,
> 2023.  After Ms. McKenzie answered the door, members of the task force entered
> the  apartment  and  noticed  an  open  second  story  window  at  the  back  of  the
> apartment.  Defendant was eventually spotted hiding in a neighboring property, in
> only his boxers, despite the cold weather.  After continued pursuit, the task force
> was able to arrest Defendant and observed injuries to his bare feet.
>
> Cell phone data indicated that Defendant's phone had been regularly present during
> nighttime hours at the apartment for weeks prior to his arrest.  Cell phone data
> further indicated that Defendant's phone was present in the apartment on November
> 26, 2023, including shortly before midnight, and that the phone was still there at
> approximately 7:00 a.m. the next morning.  At that time, the task force observed
> Defendant's phone charging on a stand in a bedroom, called the phone, and seized
> the phone after it rang.   The task force also recovered from the bedroom
> Defendant's public benefits card, Bureau of Prisons identification card, and mail
> addressed to him.  Directly in front of the bedroom, the task force found a "go bag"
> packed with, *inter alia*, sets of men's clothes.  The task force concluded that the

---

[2] Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic
filing system, and not the documents' internal pagination.

bedroom was shared by Defendant and Ms. McKenzie.

In the closet of the bedroom, the task force found two bags, each with a firearm. Subsequent forensic analysis determined that multiple locations on each firearm contained Defendant's DNA.

Ms. McKenzie testified, *inter alia*, that Defendant began staying with her in or about September 2023; that he stayed with her several times a week; that he only slept in their shared bedroom; that he kept his belongings in that bedroom, including his cell phone and "[s]urvival bag type stuff[;]" and that Defendant spent time in Ms. McKenzie's apartment when she was not there. Ms. McKenzie further testified that she was aware that the firearms were in the apartment; that Defendant had brought the firearms into her apartment; that the firearms were his; and that she had seen Defendant leave and return to the apartment with the firearms.

Defendant exercised his constitutional right not to testify at trial.

Dkt. No. 143 at 2-4 (alterations in original) (footnotes and citations omitted).

## B. Pretrial Proceedings

Prior to trial, Defendant had moved to, *inter alia*, suppress all evidence that had been seized from Ms. McKenzie's apartment on November 27, 2023. *See generally* Dkt. No. 27. Defendant argued that Ms. McKenize's consent to search her apartment "was coerced and involuntary" because "law enforcement [had] threatened her with criminal charges." Dkt. No. 27-1 at 16.

In support of Defendant's suppression motion, Ms. McKenzie submitted an affidavit in which she indicated, *inter alia*, that Defendant stayed with her overnight in her bedroom and that he had done so on the night of November 26, 2023. Dkt. No. 27-6 at ¶¶ 3-5.

Defendant also submitted his own affidavit in support of his suppression motion. Therein, he acknowledged that he "had been a regular guest at the apartment and frequently stayed overnight" in Ms. McKenzie's bedroom, including "[o]n November 26 into the morning of November 27, 2023, [when he] was an overnight guest" at Ms. McKenzie's apartment. Dkt. No. 27-7 at ¶¶ 4-5. Defendant further stated:

[ ]　　　On November 26th and on other nights when I stayed over, I had a blue

3

suitcase, a large duffel bag, and several small bags that I kept my belongings in. I generally kept these bags in Attillah's room and in her bedroom closet. Those items were present in the apartment on November 27, 2023 when law enforcement entered the apartment.

[ ]    I did not give law enforcement permission to enter the apartment or to search through my personal belongings or bags on November 27, 2023.

[ ]    I reviewed the inventory that law enforcement created of the items seized while searching the apartment. The seizures of the alleged drugs, phone, identification card, firearms, and ammunition were warrantless and were obtained from places and containers in which I had an expectation of privacy.

[ ]    When I left the apartment, none of the seized items were in plain view with the exception of my cell phone. . . .

[ ]    As a regular overnight guest in the apartment, I enjoyed an expectation of privacy in the entire apartment and especially, Attillah's bedroom, my bags and belongings. I never consented to law enforcement searching or seizing any of my property.

. . . .

[ ]    Part of my defense included establishing who owned and controlled the firearms seized from Att[i]llah's apartment while I was a guest there.

[ ]    In early December 2023, I obtained an affidavit from my uncle . . . stating that he owned and controlled the firearms seized from . . . [Ms. McKenzie's apartment] on November 27, 2023.

. . . .

[ ]    My uncle died toward the end of 2023.

*Id.* at ¶¶ 6-10, 14-15, 20.

At the suppression hearing on February 28, 2025, Defendant called Ms. McKenzie as his sole witness. Dkt. No. 45 at 170:2-15, 216:18-23. When cross-examined by the Government, Ms. McKenzie acknowledged that she knew there were firearms in her bedroom and agreed that they were Defendant's. *Id.* at 201:14-20, 203:4-16. She further testified that Defendant had shown her these firearms before, that Defendant would come and go with these firearms, and that Defendant

would bring these firearms with him when he left her apartment. *Id.* at 205:9-16. Defendant's attorney did not revisit this testimony on redirect. *Id.* at 215:5-216:19.

Less than a month after the suppression hearing, Defendant requested a representation hearing in connection with his second court-appointed attorney.[3] Dkt. No. 46. Defendant ultimately received a third court-appointed attorney. Dkt. Nos. 47-49.

On March 28, 2025, the Court denied Defendant's motion to suppress the evidence seized from Defendant's bags in Ms. McKenzie's apartment because, *inter alia*, Ms. McKenzie voluntarily consented to the search of her apartment. Dkt. No. 50 at 10-16. Having observed the demeanor of the witnesses during the hearing, the Court also noted that a portion of Ms. McKenzie's testimony had been less credible than the testimony of the law enforcement officer who obtained her consent, and that this portion of "Ms. McKenzie's testimony was also inconsistent with other record evidence." *Id.* at 5 n.5 (citation omitted).

Following the Court's denial of Defendant's motion, this matter proceeded to trial, which had been scheduled for June 9, 2025. Dkt. No. 52. On April 24, 2025, the Government moved for a continuance, Dkt. No. 53, a request to which Defendant objected, Dkt. No. 54. In part because of Defendant's opposition, the Court ultimately denied the Government's motion. Dkt. No. 59.

**C. Trial**

Trial commenced on June 10, 2025. The Government's witness list included Ms. McKenzie, who had been subpoenaed to testify, and stated that she "is expected to testify that she resided at 95 West Street in Albany, New York in November 2023, that the defendant resided with

---

[3] Defendant's first court-appointed attorney was an Assistant Federal Public Defender who is now the Federal Public Defender for this District. Dkt. No. 11. In October 2024, less than two months after Defendant's arraignment, Defendant requested, and ultimately received, a new court-appointed attorney. Dkt. Nos. 20, 25-26.

her at that residence, and that the firearms recovered by law enforcement from her residence belonged to the defendant." Dkt. No. 71 at 2. Defendant's witness list stated that he "does not intend to call any witnesses[.]" Dkt. No. 78 at 1.

The lead prosecutor's opening statement to the jury included the following:

> You will also hear from Ms. McKenzie herself who will tell you that she still cares deeply for the defendant. She will tell you more about the defendant and she will tell you more about the firearms. She will tell you that the defendant was consistently staying with her at her apartment, 95 West Street, in the month of November of 2023, and that both of the firearms belong to the defendant. She will also tell you that she has no explanation as to how her DNA got onto those guns.

> Members of the jury, as you listen to her testimony, I'd like for you to keep a few things in mind. Ms. McKenzie has not been charged with a crime. She is not on trial here; the defendant is. No matter what her connection was to those firearms, that connection has absolutely no bearing on whether the defendant possessed those firearms.

> Finally, you will hear from the defendant himself in his recorded jail calls and text messages where he continually tries to control Ms. McKenzie, and, in his own words, makes sure she stays on point.

Dkt. No. 124 at 200:6-25.

Defendant's attorney began his opening statement to the jury with the following:

> Good afternoon, ladies and gentlemen. There is a dispute in this case. And the dispute is over, what does possession mean. What evidence proves that someone possessed something.

> Now we expect the evidence to show that my client didn't have any handgun in his hand, in his pocket, anywhere near him when the weapons were recovered or when he was recovered. The evidence will show you that he ran and that he was in his underwear outside of the building where the weapons were recovered. But the evidence will also show you that it was not his apartment where the weapons were recovered. The evidence will show you that it was not his closet where the weapons were recovered. The evidence will show you that they weren't his bags where the evidence were recovered -- where the weapons were recovered. It wasn't his bedroom. And we expect you to hear that all that testimony from not only the government's witnesses, but even this witness called Attillah McKenzie.

> So the question becomes, and the Judge will read you this, what does 'knowingly possessed' mean? For someone to knowingly possess something. He is guilty of -

6

- the evidence will show that he's not guilty of knowingly possessing anything. It did have his DNA on it, but it also had other DNA on it. What he is guilty of in this case is being on probation, skipping his probation, and running when the police came to arrest him.

. . . .

The argument in this case is over constructive possession, and what evidence will show that it was constructively possessed, that this is the weapons at this point. The same evidence that the government is going to show you is the same evidence that I'm going to use to defend my client. It's the evidence that was in the room. It's the evidence that is on the body cams. This is the evidence that shows both sides of the case. And at the end, I'm going to ask you to find him not guilty of constructively possessing firearms on November 27, 2023, because I believe the evidence will show you that he didn't. It's legally impossible that he possessed those firearms.

Dkt. No. 124 at 202:16-203:16, 204:11-22.

On June 11, 2025, after the jury had been dismissed for the day and prior to Ms. McKenzie being called to testify, her court-appointed attorney requested a conference in chambers.[4] Dkt. No. 125 at 239:14-24. Defendant's attorney attended this conference. *Id.* at 240:1-3. During this conference, Ms. McKenzie's attorney shared his recollection of a recent interaction in the courthouse hallway between himself, his client, one of the Government's two prosecutors, and a federal agent. Ms. McKenzie's attorney was clear that, as for the federal agent, "[h]e and I shook hands, but he otherwise did not say anything." *Id.* at 241:12-13. Ms. McKenzie's attorney stated that the prosecutor asked Ms. McKenzie about messages on Defendant's phone and, when Ms. McKenzie denied any knowledge, the prosecutor:

stated in sum and substance, you know, lying to a federal -- this is a federal agent, indicating to the [Bureau of Alcohol, Tobacco, and Firearms ("ATF")] agent, that lying to a federal agent is a crime. And I haven't listened to these calls -- or I haven't read these messages, but if you are lying, I'll take action. And I don't

---

[4] The Court had appointed Ms. McKenzie counsel in advance of the suppression hearing, following a February 26, 2026 status conference with the parties during which it became clear that Ms. McKenzie's DNA was also present on the firearms that had been seized from her apartment. *See also* Dkt. No. 36.

remember her exact words, but it was something to the effect of I will do something about it.

And so my issue with that, number one, is that the United States Attorney was threatening a witness that they had subpoenaed with potential criminal charges about something even the government didn't know what they were talking about. And, secondarily, that their chosen witness through this event, and also, the -- a federal agent supposedly being lied to was also a trial witness who had yet to be called. This was immediately before his testimony.

So I am in a position now where my client has no option except to elect either not to testify or to invoke the Fifth Amendment that -- because she doesn't know what the government has or doesn't have. I don't -- maybe the government doesn't know. And in light of I think a lot of the testimony today that may be the most prudent course of action, unless she is given full immunity for testifying, I think that would be the only out. So that's where we are.

*Id.* at 241:24-242:22. When asked by the Court, the prosecutor responded:

We have had separate conversations with Ms. McKenzie that some of her testimony at the suppression hearing was not credible and to be called as a witness and you lie in your testimony and you perjure yourself, you will be prosecuted for that. And your only job when you testify is to tell the truth.

In between witnesses today, [Defendant's attorney] said he might want to power up Government's Exhibit 30 and retrieve messages that were on the cell phone to show Attillah McKenzie. So at that point, we started worrying about that because they have some jail texts, and I'm trying to locate it, that suggests that Ms. McKenzie still has something in her possession or could still act on something, that he is going to be okay if she is able to do that. Something to that effect, and we are trying to locate those.

The reason that I wanted to speak with Ms. McKenzie, we always bring a witness with us when we are speaking with a witness in case she said something that we would want him to testify about later. We commonly do that with a case agent. In this case, it would be [the Deputy United States Marshal who had obtained Ms. McKenzie's consent to search her apartment on November 27, 2023]. We had not used him when we have interacted with Attillah McKenzie in this case because they had that history on the interaction on November 27th. So I attempted to get [ ], our legal assistant, to come with us as a witness. When I went out and I wanted to speak with her, but I did want a law enforcement officer or somebody to be a witness to it, I looked around, our witness coordinator was there, I asked her to come. She had to help with [a different] trial, so she wasn't available.

So then [the ATF special agent] was sitting there. [He] is an expert witness on a very, as you know, your Honor, narrow interstate nexus jurisdictional element

issue.  He's not a fact witness to the offense, although we often do have law enforcement officers who are also [ ] present for witness interviews, laypeople.

When we went over, I found that Attillah McKenzie appeared to be being evasive, as she has seemed to be at some times.  And I wasn't trying to threaten, harass, or telling [her we] would do something, but I warned her, as I have seen others do in the presence of federal agents, that she is on notice that if she is lying to us and we find out about that, that is a crime.  Which I felt was in keeping with telling her that if you perjure, if you lie, that's not okay.

Obviously, I think the government might be more prejudiced by this interaction than anyone, if she is not willing to testify.  Although in my office, we are going through the process to try to grant her immunity from federal prosecution for any offenses so that she could testify without fear of being prosecuted by federal authorities.

*Id.* at 243:1-244:25.

Ms. McKenzie's attorney then reiterated his perspective that the prosecutor had threatened his client, and again advocated his position that "I do really believe that, yeah, as long as immunity is granted, she may testify."  *Id.* at 245:13-18.

Following the Court's inquiry, Defendant's attorney clarified that he did not intend to cross-examine Ms. McKenzie on the contents of the phone, and the prosecutor confirmed that the Government had not previously examined the contents of the phone.  *Id.* at 245:21-246:24.  After learning that the Government had initiated its internal process to grant Ms. McKenzie immunity, the Court requested an update the next morning, prior to trial resuming.  *Id.* at 247:11-248:5.

On the morning of June 12, 2025, the Government and Ms. McKenzie's attorney informed the Court and Defendant's attorney that Ms. McKenzie had entered into a limited immunity agreement with the Government with respect to the events at her apartment on November 27, 2023. Dkt. No. 126 at 3:5-4:6.  The Government again stated that it had no information about the cell phone that they intended to use, and Defendant's attorney reiterated his intention not to use the phone with Ms. McKenzie.  *Id.* at 4:9-19.  Ms. McKenzie's attorney indicated that his client was

now amenable to testifying because of the immunity agreement, and that he was also comfortable with her doing so because the phone was not going to be used. *Id.* at 4:7-9, 20-23.

Once trial resumed, the Government called Ms. McKenzie. *Id.* at 8:10-11. Ms. McKenzie was examined by the lead prosecutor, who had not been present for the interaction in the hallway the day before. The ATF special agent who had been in the hallway was not present in the courtroom during Ms. McKenzie's testimony. The lead prosecutor elicited that Ms. McKenzie did not want to be testifying; had been served with a subpoenaed to testify; and that Ms. McKenzie had also "enter[ed] into an agreement with the United States wherein the United States agreed not to seek federal criminal charges against [her] for items seized by law enforcement on November 27th of 2023 from" her apartment. *Id.* at 9:13-10:1. Ms. McKenzie further testified that she had a prior romantic relationship with Defendant, and that they remained "really good friends. Like I have a lot of love for him." *Id.* at 10:21-11:5. The substance of Ms. McKenzie's subsequent testimony is summarized above. *See supra* Section II.A. As also detailed above, the lead prosecutor had previewed much of Ms. McKenzie's anticipated testimony during her opening statement on June 10, 2025, which was prior to the hallway interaction with the second prosecutor on June 11, 2025.

On cross, Ms. McKenzie admitted, *inter alia*, that she had signed an agreement with the Government on the very day of her testimony; that she had agreed to testify as a result of that agreement; and that she couldn't be charged with anything related to the firearms found in her apartment. Dkt. No. 126 at 25:2-14. Defendant's attorney offered the immunity agreement into evidence, which the Court accepted without objection from the Government. *Id.* at 26:20-25. Defendant's attorney went on to question Ms. McKenzie about preparing for her testimony by meeting with the Government, including meeting with the Government during trial. *Id.* at 27:5-

15.  Following further questioning, Ms. McKenzie acknowledged that she knew her DNA was on the firearms and admitted that she did not have any explanation as to why.  *Id.* at 27:19-28:2. Defendant's attorney elicited that at least one other specific individual regularly carried firearms into Ms. McKenzie's apartment, a topic which he explored in some detail.[5]  *Id.* at 33:21-36:10. Defendant's attorney also questioned Ms. McKenzie about ammunition recovered from her apartment that was for a caliber of firearm different than those Defendant was charged with possessing.  *Id.* at 37:14-21.  The Government made only one minor objection during Ms. McKenzie's cross-examination, through its lead prosecutor and on a different topic than those just discussed.  *Id.* at 29:25-30:5.  Following cross-examination, the Government asked no further questions of Ms. McKenzie.  *Id.* at 41:12-20.  In total, the jury heard less than forty minutes of testimony from Ms. McKenzie on the third day of the Government's case.  Dkt. No. 95 at 1-2.

Consistent with Defendant's witness list, he rested without calling any witnesses.  Dkt. No. 126 at 68:12-19.

The Government argued during its closing on the afternoon of June 12, 2025 that, *inter alia*:

> So let's talk about Attillah McKenzie, the defendant's girlfriend.  I'm going to pause before I talk about what she said and say that all the evidence we have talked about doesn't depend on her testimony at all.  Her testimony is corroborated by this evidence, and this evidence corroborates her testimony.  And we are going to talk a little bit about how you should go about evaluating her credibility.  But keep in mind, please, that we will not ask you to take her at her word.  Everything that we say about Attillah McKenzie is something that's proven otherwise in this case.
>
> . . . .
>
> Now I'm going to talk about [ ] evaluating credibility, and that is only your job. I'm just going to ask you to keep something in mind as you do that.  You know

---

[5] None of these individuals were Defendant's uncle.  The nature of the questions about these individuals from Ms. McKenzie's personal life, however, indicates that Defendant's attorney had conferred with Defendant in order to develop the cross-examination of Ms. McKenzie.

when we look at those DNA reports, it didn't just show that Andre Decker's DNA was on those guns. It showed that Attillah McKenzie's DNA was on the guns. And she took that stand and she told you she had no idea how that happened. That she never personally handled the firearm. And that might fly in the face of common sense and what you think might have happened based on what you heard about DNA evidence. And that should give you pause about what you should believe that she tells you.

And what I'd like to emphasize to you is when you think about Attillah McKenzie and whether she was telling you the whole truth or sometimes the truth or making things up as you go, you could -- you could reach a wide range of opinions on Attillah McKenzie, but it doesn't really matter as far as the defendant himself is concerned.

My colleague [ ] told you in her opening statement whatever her connections are to that gun, both guns, has no bearing on his guilt. And that's because I think [on] the defendant's best day, she jointly possessed those firearms with him. And you heard from Judge Nardacci that joint possession counts as possession. That the defendant jointly possessed those firearms with Attillah McKenzie. He possessed those firearms. That's the law. The law doesn't give you a break as a felon violating this crime if you are sharing the guns with someone else. And based on all the evidence you have heard in this case, the defendant did possess those firearms.

*Id.* at 114:1-11, 115:12-116:16.

During his closing on June 12, 2025, Defendant's attorney argued that the Government had not proven Defendant's constructive possession of firearms because, *inter alia*, "dominion or control, in my mind, are the important words in that definition. The firearms in that apartment, even though Mr. Decker had been into that apartment, so had other people who had firearms themselves." *Id.* at 124:16-19. Defendant's attorney proceeded to bolster this argument with various reasons why Ms. McKenzie's testimony regarding Mr. Decker was not credible:

So she gets a grant of immunity, which means she can't be prosecuted for anything she did at 95 West Street. And I put that into evidence and you can read it yourself. So the question then becomes, why wouldn't she testify without immunity? Because she could have been charged with a crime and she had to find a way out of this. So she got immunity for anything that happened in there.

And by the way, she may or may not have committed a crime, I don't really know, but it doesn't really matter when you are from 95 West Street. Guns in the house, you are in the house, you can be -- you can be arrested for a crime. She's not going

12

to – she's going to be in a tough spot.

So what did she do on the stand?  That's what I'm getting at.  So she's a survivor. She signed an immunity agreement, she testified, and she provided the evidence she thought she needed to provide to get -- to keep moving down the road to get back to Miami to her two kids and put this in her rearview mirror.  And she said that what clearly to me appears to be a woman's bag with tampons in it was my client's.  And that she knew the blue bags on the floor of her closet, she knew about them, but didn't know how a gun got in them.  And she said that she didn't know how her DNA got on the guns.  And she -- what else did she say?  That's about the -- what I recall the sum and substance of her testimony was.

But what she did testify she was -- oh, and then she talked about these other people in her house who also were carrying handguns.  And one of them was a kid she raised, the twin, [ ].  She raised [him] like her own.

So I submit to you that there is DNA evidence in this case that has three sets of DNA on it. One being Attillah McKenzie who testified.  One being Andre Decker who is sitting over there.  And the third person being this person[, the kid she raised].  And that the conversations you are hearing on this -- these [jail] messages are the conversations about whether she should say that.  Whether she should say that these are not Andre Decker's guns.  They are [the kid]'s guns.

Now, you are not here to determine if my client, Andre Decker, has ever had a handgun in his life two years ago, yesterday.  That's not what we are here for.  We are here to determine if the two handguns listed in the indictment, those two handguns, did Andre Decker constructively possess those.  And in order to constructively possess those, he would have had to know -- known that they were there.  If he didn't know they were there and he didn't own them and they weren't his, but they were [the kid]'s or maybe Attillah McKenzie's, who's got immunity, if he didn't know they were there and if they weren't his, he didn't put them there, then he can't be convicted of constructively possessing them.  He can't.  It's impossible.  Then it would have to be his.  And if they were his, guess what?  They would be in his bag or if he fled that apartment, they would have been with him.

*Id.* at 127:16-129:20.  The Government did not object during Defendant's closing argument.  *See*

*generally id.* at 118:18-131:12.  In a short rebuttal, the Government argued, *inter alia*:

I have Defendant's Exhibit 1.  This is the immunity letter that Ms. McKenzie and my office signed, that her attorney signed.  It's dated June 11, 2025.  And there's testimony that came out that she just entered this immunity agreement.  Note that days ago, my colleague told you what Ms. McKenzie would say before this agreement was signed.  And when she took the stand, that's exactly what she testified about.  Those are the defendant's guns.  I was in love with the defendant. He was staying with me.  I'm not sure how my DNA got on the gun.

> Again, you don't have to believe everything she says, but the idea that now she's coming out of the woodwork as soon as she has this immunity letter to tell her story doesn't match up with the facts of her.
>
> I also want you to know that this immunity letter doesn't just confirm her immunity for the firearms that were found. It spells out that she has an obligation to testify truthfully. And any immunity she received can be revoked if she lies.
>
> It says, pursuant to this agreement, the witness will testify truthfully and completely at trial in United States v. Andre Decker with respect to any matters about which the witness may be questioned. The witness will not falsely implicate anyone in criminal activity. The witness will not minimize, exaggerate, or conceal the criminal conduct of herself or any other person. This agreement to confirm immunity does not provide any protection for the witness against a possible prosecution for perjury, false statements, or obstruction of justice based on her testimony or otherwise. That is her immunity letter.

*Id.* at 134:19-135:23. The jury began their deliberations on the afternoon of June 12, 2025.

On the morning of June 13, 2025,[6] Defendant's attorney moved for a mistrial at Defendant's request, on the stated basis that "[m]y client informs me that he has information that an ATF agent threatened Attillah McKenzie on June 11th at some point with charging her with conspiracy to possess ammunition." Dkt. No. 127 at 2:24-3:5. The prosecutor who had been present in the hallway on June 11, 2025 responded that the Defendant's information was incorrect and there was no basis for a mistrial. *Id.* at 3:17-4:12. The Court agreed, and denied Defendant's motion. *Id.* at 4:13-15. As detailed above, according to Ms. McKenzie's attorney who was present for the duration of the interaction, the ATF special agent said nothing besides greeting the attorney

---

[6] The night before, Defendant made a number of recorded calls from the Albany County Jail. Dkt. No. 154 at 12. One was to a man Defendant referred to as his cousin. *Id.* The recording of that call submitted by the Government in connection with the Motion indicates that the man had spoken with Ms. McKenzie about the hallway interaction on June 11, 2025. Dkt. No. 154-1 at 02:12-02:15. Defendant explained to the man that he would move for a mistrial because the ATF had "threatened her, nah what I mean, with a, with a, um, a, charge if she doesn't testify, nah I mean, against me, you heard? Like to say [the firearms] was mine." *Id.* at 15:57-16:17. In response, the man clarified that "[b]asically, the way they put it, is you gotta test–, like, we want you to tell the truth type shit[.]" *Id.* at 16:17-16:24.

at the outset.  Dkt. No. 125 at 241:11-13.

The jury subsequently resumed their deliberations and reached a verdict around lunchtime on June 13, 2025.  Dkt. No. 127 at 5:13-6:4.

### D.  Rule 29 Motion

Following Defendant's conviction at trial, Defendant's third and fourth court-appointed attorneys[7] made a renewed motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  Dkt. Nos. 107, 137.  After considering the weight of the evidence at trial, the Court denied this motion.  Dkt. No. 143.

## III.    STANDARD OF REVIEW

"Rule 33 provides that, '[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.'"  *United States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021) (alteration in original) (quoting Fed. R. Crim. P. 33(a)).  "The district court 'has broad discretion to decide Rule 33 motions based upon its evaluation of the proof produced.'"  *United States v. Mensah*, 110 F.4th 510, 528 (2d Cir. 2024) (quoting *United States v. McPartland*, 81 F.4th 101, 123 (2d Cir. 2023)).  Moreover, "[i]n evaluating a Rule 33 motion, the court must 'examine the entire case, take into account all facts and circumstances, and make an objective evaluation,' keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'"  *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (quoting *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)).  Ultimately, "[f]or a trial judge to grant a Rule 33 motion, [s]he must harbor a real concern that an innocent person may have been convicted."  *United States v. Alequin*, 792 F. App'x 859, 863 (2d Cir. 2019) (quoting

---

[7] After Defendant's third court-appointed attorney filed the motion, Defendant requested a representation hearing, following which he received a fourth court-appointed attorney and numerous extensions of time to supplement the motion.  Dkt. Nos. 107-10, 112-14, 117, 133, 136.

*United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013)).

## IV.    DISCUSSION

The Motion argues that Defendant's conviction should be vacated and a new trial ordered because of newly discovered evidence.  Dkt. No. 147.  Defendant contends that alleged threats by federal authorities against Ms. McKenzie on November 27, 2023 and June 11, 2025 constitute such evidence.  Dkt. No. 147-1 at ¶¶ 4, 7.

"To prevail on a Rule 33 motion based on a claim of newly discovered evidence, the defendant must show '(1) that the evidence is newly discovered after trial; (2) that facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) that the evidence is material; (4) that the evidence is not merely cumulative or impeaching; and (5) that the evidence would likely result in an acquittal.'" *United States v. Hild*, No. 23-6136-cr , 2025 WL 2924205, at *1 (2d Cir. Oct. 15, 2025) (summary order) (quoting *James*, 712 F.3d at 107).

The Government primarily argues that Defendant's alleged evidence is not newly discovered; is cumulative; and would not likely result in acquittal.  Dkt. No. 154 at 16-22.  The Court agrees.

Foremost, Defendant's alleged evidence is not newly discovered after trial.  As the Government notes, "[b]efore trial, both the defendant and defense counsel knew that Ms. McKenzie felt threatened by the government when the defendant was arrested in 2023.  She testified to as much as the defendant's witness at the suppression hearing.  Indeed, that was the entire thrust of the defendant's motion to suppress."  Dkt. No. 154 at 16.  The Government is correct.  *See supra* Section II.B; *see also United States v. Owen*, 500 F.3d 83, 89 (2d Cir. 2007) ("We have never before held that a new trial may be granted pursuant to Rule 33 on the basis of

16

evidence that was known by the defendant prior to trial . . . and we decline to do so here."). Additionally, both Defendant and his attorney also knew during trial about the alleged threat against Ms. McKenzie on June 11, 2025.  For example, Defendant's attorney was present when Ms. McKenzie's attorney detailed the hallway interaction; Defendant's attorney then proceeded to cross-examine Ms. McKenzie about the nature of the resulting immunity agreement and argue the significance of that agreement to the jury.  *See supra* Section II.C.  Defendant observed that cross examination and argument and—following at least one jail house call regarding the hallway interaction— requested that his attorney move for a mistrial as a result of the hallway interaction. *Id.*  Given this record, the evidence of any alleged threat is not newly discovered after trial.  *See, e.g., United States v. Simels*, 636 F. App'x 13, 15 (2d Cir. 2015) ("Evidence is not considered 'new' if the defendant was aware of it prior to trial, or it 'could have been discovered by the defense before or during trial[.]'") (citations omitted); *United States v. Forbes*, 790 F.3d 403, 408 (2d Cir. 2015) ("[W]e hold that evidence is excluded from the meaning of 'newly discovered' under Rule 33 where (1) the defendant was aware of the evidence before or during trial, *and* (2) there was a *legal* basis for the unavailability of the evidence at trial, such as the assertion of a valid privilege.").

Second, even if the alleged evidence were newly discovered, it is nonetheless cumulative and merely impeaching.  *See, e.g., United States v. Parse*, 789 F.3d 83, 109-10 (2d Cir. 2015) ("In addition, even if the evidence was newly discovered within the meaning of Rule 33(b), that evidence must, in order to warrant a new trial, be 'material,' not merely cumulative.") (collecting cases).  On direct, the Government elicited that Ms. McKenzie did not want to be testifying; that she had been subpoenaed; and that she had also entered into an immunity agreement with the Government.  *See supra* Section II.C.  On cross, Defendant's attorney further elicited that Ms. McKenzie had met with the Government to prepare for her testimony; that her DNA was also on

17

the firearms that Defendant was charged with possessing; that she had no explanation for why; that she had signed an immunity agreement with the Government that very day; that she could no longer be charged with possession of those firearms; and that she was testifying as a result of her immunity agreement, which Defendant's attorney admitted into evidence without objection from the Government. *Id.*

In a skillful closing argument, Defendant's attorney attacked the credibility of Ms. McKenzie's testimony that incriminated Defendant and highlighted reasons why her testimony regarding the possession of firearms in her apartment by others established that the Government had failed to prove its case against Defendant. *Id.*; *see also United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) ("[Defendant] argues that these witnesses were not credible because their accounts were riddled with inconsistencies, and they had motives to testify falsely. These arguments, however, were forcefully presented to the jury through the vigorous cross-examinations and arguments of [defendant]'s able trial counsel. Nevertheless, the jury, which had the opportunity to see the witnesses testify, to weigh their testimony against the other evidence in the case, and to hear the arguments of the prosecution, found [defendant] guilty beyond a reasonable doubt[.]") (affirming district court's denial of Rule 33 motion). In short, the jury already had ample information from which to assess Ms. McKenzie's reasons for testifying and her potential bias(es). The alleged evidence is thus cumulative. *Id.* at 349-50 ("At best, [the evidence] would have afforded defense counsel additional grounds on which to impeach prosecution witnesses whose credibility had already been vigorously challenged . . . . The district court did not abuse its discretion in concluding that such evidence was insufficient to raise 'a real concern that an innocent person may have been convicted.'") (citations omitted).

Third, even if the alleged evidence were newly discovered and non-cumulative, it is not

18

likely to result in acquittal.  The core of Ms. McKenzie's testimony—that Defendant stayed in her apartment and the firearms found there were his—has remained unchanged throughout this case: in connection with Defendant's pretrial suppression motion, when Ms. McKenzie testified as Defendant's witness at an evidentiary hearing in February 2025; as previewed by the lead prosecutor during opening statements on June 10, 2025, prior to the hallway interaction the next day; and during Ms. McKenzie's subsequent testimony as a Government witness on June 12, 2025. *See supra* Section II.B-C; *Alston*, 899 F.3d at 146 ("In evaluating a Rule 33 motion, the court must 'examine the entire case, take into account all facts and circumstances, and make an objective evaluation[.]'") (citation omitted).  As the Government notes, "[t]o date, [D]efendant has never challenged the truthfulness of these statements."  Dkt. No. 154 at 6.

The Court agrees with the Government that the record is devoid of any indication that Ms. McKenzie was coerced to provide particular testimony to incriminate Defendant, or to refrain from providing particular testimony that could benefit Defendant.[8]  Dkt. No. 154 at 9-10.  The Government is also correct that the contemporaneous on-the-record representations during trial by Ms. McKenzie's attorney and a prosecutor—both of whom were present for the duration of the hallway interaction—indicate that the interaction arose as a result of an ancillary issue and was

---

[8] The Motion does not raise a due process challenge based on the hallway interaction or Ms. McKenzie's subsequent testimony on the third day of trial.  Regardless, such a challenge would fail for numerous reasons.  *See, e.g., United States v. Lebedev*, 932 F.3d 50, 55 (2d Cir. 2019) ("To demonstrate a due process violation based on the government's intimidation of witnesses, the defendant must show three elements: (1) 'that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means,' (2) 'bad faith on the part of the government,' and (3) that 'the absence of fundamental fairness infected the trial.'") (quoting *United States v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000)); *see also United States v. Polanco*, 510 F. App'x 10, 12 (2d Cir. 2013) ("Courts find no bad faith where government interaction with the witness is to promote countervailing public interests.  For example, a prosecutor does not engage in misconduct merely by interviewing a potential defense witness, nor by warning a defense witness of the consequences of committing perjury[.]") (citations omitted).

19

independent of Ms. McKenzie's core testimony that the firearms in her bedroom were Defendant's. *Id.* There is thus no basis to conclude that Ms. McKenzie could have provided additional testimony regarding the circumstances of her immunity agreement that would have been likely to result in Defendant's acquittal. *Cf. United States v. Wellman*, 26 F.4th 339, 352-53 (6th Cir. 2022) (affirming district court's denial of defendant's mistrial motions based on a prosecutor threatening to charge a hostile witness with perjury). This is particularly so given the weight of the Government's other evidence at trial. *Mensah*, 110 F.4th at 528 ("The district court 'has broad discretion to decide Rule 33 motions based upon its evaluation of the proof produced.'") (citation omitted).

It also bears mentioning that Defendant does not argue that Ms. McKenzie should not have taken the stand at all. *See generally* Dkt. No. 147. Indeed, Ms. McKenzie's trial testimony was central to Defendant's trial strategy, as previewed during his attorney's opening statement and emphasized in his closing argument, including because Ms. McKenzie was the only witness who could testify that other individuals besides Defendant possessed firearms in her apartment. And while Defendant certainly had no obligation to question Ms. McKenzie during the Government's case, the effectiveness of his attorney's trial strategy is clear: the jury's sole question during deliberations was about the very issue to which Defendant's attorney directed them during his closing argument, based on Ms. McKenzie's testimony. *See, e.g.,* Dkt. No. 126 at 124:8-19 ("And I submit to you there is no actual possession here. . . . . Then you must turn to the next part of the law which is constructive possession. . . . So dominion or control, in my mind, are the important words in that definition. The firearms in that apartment, even though Mr. Decker had been into that apartment, so had other people who had firearms themselves."); Dkt. No. 100 (jury note requesting clarification on constructive possession).

20

Additionally, both the Government and Defendant's attorney questioned Ms. McKenzie's credibility in their closing arguments.  *See supra* Section II.C.  And Defendant's attorney impeached Ms. McKenzie and attacked her credibility during closing far more forcefully as a result of the immunity agreement.  *See, e.g.,* Dkt. No. 126 at 127:19-128:8 ("So she gets a grant of immunity, which means she can't be prosecuted for anything she did at 95 West Street.  And I put that into evidence and you can read it yourself.  So the question then becomes, why wouldn't she testify without immunity?  Because she could have been charged with a crime and she had to find a way out of this.  So she got immunity for anything that happened in there. . . . So what did she do on the stand?  That's what I'm getting at.  So she's a survivor.  She signed an immunity agreement, she testified, and she provided the evidence she thought she needed to provide to get -- to keep moving down the road to get back to Miami to her two kids and put this in her rearview mirror.").  The jury was also able to assess Ms. McKenzie's credibility on the stand as she, *inter alia*, offered no explanation on cross for why her own DNA was on the firearms, one of which was in small bag with feminine hygiene products in her bedroom closet.  *See, e.g., James*, 712 F.3d at 107 ("While it may be that the contents of the [alleged evidence] provide a reason to doubt [a cooperating witness'] credibility, 'a new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.'  In any event, there is no 'reasonable probability' that the outcome of the defendants' trial would have been different had the contents of [the alleged evidence] been disclosed, even if believed.") (citations omitted) (affirming district court's denial of Rule 33 motion based on alleged newly discovered evidence).

In sum, the Government presented substantial evidence of Defendant's possession of firearms at trial, some of which was previously detailed in the Court's decision denying

Defendant's Rule 29 motion. Dkt. No. 143. The jury had the opportunity to assess the Government's evidence, as well as Ms. McKenzie's credibility on the stand, and heard extensive argument from Defendant's counsel, including with respect to Ms. McKenzie's testimony. The jury proceeded to find Defendant guilty. Defendant's Rule 33 Motion raises no valid reason to think that Defendant is innocent and the jury's guilty verdict should be overturned. *United States v. Lettieri*, No. 24-1594, 2026 WL 143328, at *3 (2d Cir. Jan. 20, 2026) (summary order) ("Because the evidence was sufficient to sustain the conviction under Rule 29 and the record reveals no extraordinary circumstances or manifest injustice, the district court did not abuse its discretion in denying Rule 33 relief after concluding that there was no "real concern that an innocent person" had been convicted[.]") (quoting *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009)). As a result, the Court denies Defendant's Motion.

## V.    CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendant's Motion, Dkt. No. 147, is **DENIED**; and the Court further

**ORDERS** that the Clerk serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: May 1, 2026
      Albany, New York

Anne M. Nardacci
U.S. District Judge

22